**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **TOTTI SIMS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **2:24-cv-1770-EGL** |
| | ) | |
| **CHIPOTLE SERVICES, LLC,** | ) | |
| | ) | |
| **Defendant.** | ) | |

<u>**MEMORANDUM OPINION & ORDER**</u>

On December 20, 2024, Totti Sims sued Chipotle Services, LLC. *See* Doc. 1. On February 13, 2025, Sims filed an amended complaint. *See* Doc. 12. On March 11, 2026, Chipotle moved for summary judgment. *See* Doc. 47. For the reasons below, the motion is **GRANTED**.

**BACKGROUND**

Totti Sims, a black woman and U.S. citizen, worked for Chipotle from 2018 to 2023. Doc. 60 at 8-9; Doc. 52 at 5. She began as a cashier in Memphis, Tennessee, and advanced through the positions of Kitchen Manager, Service Manager, and Apprentice. Doc. 60 at 8-9; Doc. 52 at 5.

While an Apprentice, Sims also drove for DoorDash. Doc. 52 at 6. Chipotle contends that on at least 631 occasions between April and August 2022, Sims delivered for DoorDash while clocked in at Chipotle, working roughly 114 hours worth no less than $2,961 at her $17.90 hourly rate, in violation of policies requiring

accurate time records. *Id.* at 6-7 & n.1. Chipotle did not learn of this conduct until after it terminated Sims's employment in June 2023. Chipotle asserts that this after-acquired evidence shows that Sims would have been terminated and thus cannot be awarded reinstatement or front pay for her claims. *Id.* at 25-26; Doc. 63 at 22-23.

Unaware of Sims's conduct, Chipotle promoted her to General Manager of its Vestavia Hills restaurant on November 14, 2022. Doc. 44-1 at 31. Sims held this salaried position, except for medical leave in the spring of 2023, until her termination on June 24, 2023. Doc. 60 at 8-9; Doc. 52 at 7.

As General Manager, Sims initially reported to Field Leader Sammy Pilato. Doc. 60 at 9; Doc. 52 at 8. In January 2023, Field Leader Guadalupe Cervantes, a Hispanic man, assumed responsibility for the territory and became her supervisor. Doc. 60 at 9; Doc. 52 at 8. Cervantes in turn reported to Team Director David Waters. Doc. 60 at 9; Doc. 52 at 15. It was Cervantes who terminated Sims on June 24, 2023. Doc. 60 at 36; Doc. 52 at 21-22.

Sims's new role came with a bi-weekly salary of $2,384.61—roughly $1,192 per week, or 155% to 181% greater than the hourly wages of the next two most senior employees she supervised—plus bonus opportunities for which those employees were not eligible. Doc. 52 at 8, 38; Doc. 60 at 6.

And the new role came with numerous responsibilities. As the location's highest-ranking employee, Sims was responsible for the restaurant's day-to-day

operations, including hiring, firing, training, scheduling, ensuring food-safety compliance, and reviewing vendor invoices. Doc. 52 at 8-13; Doc. 60 at 6-7. She terminated at least 27 employees for cause during her tenure. Doc. 52 at 11-12; Doc. 60 at 6-7; *see also* Doc. 45-31 at 2. That she customarily supervised two or more employees is not genuinely disputed. *See* Doc. 52 at 14.[1]

Sims also had responsibility for managing the location's finances to promote its profitability. Doc. 52 at 12. She scheduled employees to work hours that were consistent with the needs of the location, and she managed labor costs by instructing employees to clock out early if she determined their tasks were complete. *Id.* (citing Doc. 44-1 at 37). Sims ensured employees received correct wages, including resolving payroll issues when employees failed to correctly record their hours. *Id.* (citing Doc. 44-1 at 36; Doc. 45-10). Sims prepared food budgets and conducted monthly inventory assessments to ensure Chipotle was ordering the right amount of food for the location. *Id.* (citing Doc. 44-1 at 30-31, 37). Sims also reviewed and

---

[1] Sims disputes this in her response to Chipotle's motion, *see* Doc. 60 at 7, but cites only two pieces of evidence: first, her EEOC Charge, wherein she states that she "worked alone in the store for several hours a day and then only had 1-2 employees working for another period of time," *see* Doc. 44-2 at 6; and second, she cites her deposition transcript, where she re-affirms this statement, *see* Doc. 44-1 at 44. But this does not create the dispute she thinks it does because "customarily supervising" two or more employees is not inconsistent with sometimes working alone, and she admits in the statement that when she wasn't working alone, she regularly supervised "1-2" other employees. Moreover, later in her response, Sims lays out the four elements Chipotle needs to prove to show that Sims was a *bona fide* executive, including whether she "customarily and regularly supervise[d] 2 or more employees." Doc. 60 at 40. Sims concedes that element on the next page of her brief when she asserts that there are only "two issues in this case," neither of which are the element of customarily and regularly supervising two or more employees. *Id.* at 41.

approved vendor invoices to ensure that Chipotle paid only the expenses that were due, and she prepared and maintained the location's profit and loss statement. *Id.* at 12-13.

As General Manager, Sims also had ultimate responsibility for food safety and could be disciplined for failing third-party food safety audits even if she was not present in the restaurant when the audit occurred. *Id.* at 11. As Sims put it, "my name is on the store." Doc. 44-1 at 38. Thus, she trained employees on food safety and food preparation, ensured they complied with Chipotle's requirements, and administered food safety exams, which she proctored in the restaurant's office. Doc. 52 at 10.

The parties dispute how much time Sims spent on these tasks versus the work typically performed by hourly employees. Chipotle maintains that her primary duties were managerial. Doc. 52 at 7-13. Sims contends that chronic understaffing forced her to spend most of her time on hourly tasks, such as cooking, cleaning, and serving, and to work roughly 70 or more hours per week. Doc. 60 at 9-14. She testified that Cervantes and Waters performed manual labor at the store because of understaffing, that she had to seek permission to hire and was at times refused, and that Cervantes approved schedules before she distributed them. *Id.* She recalled two employees she was not permitted to rehire, but she could not remember their names and, as to one, did not know the reason why he was ineligible. Doc. 52 at 37.

Between April and May 2023, Sims filed three complaints through Chipotle's HR hotline, all handled by HR Analyst Mandy Keller-Blanton. Doc. 60 at 18-22, 51 n.1. The first was filed anonymously on April 7, 2023, and alleged race discrimination. *Id.* at 19-21. Sims claimed that Hispanic employees received preferential treatment, that Cervantes overruled her decisions concerning Hispanic employees and shielded them from discipline, that Cervantes and Rebecca Sandoval were involved in an improper relationship, and that Cervantes spoke Spanish to Hispanic employees to exclude Sims. *Id.* On April 20, 2023, Sims lodged another anonymous complaint, alleging that Cervantes was soliciting statements against her. *Id.* at 21-22. Waters investigated both complaints and, in doing so, questioned Cervantes about his conduct. *Id.* at 52.

Sims's last day before she took leave was April 18, 2023, and her FMLA leave began the next day. Doc. 44-1 at 34. She attributed the leave to a workplace-related mental-health crisis. Doc. 60 at 23. She filed her third complaint on May 30, 2023, this time under her own name, alleging that Cervantes and Waters were preventing her from returning to work after her leave ended. *Id.* at 22. Benefits Analyst Jack Murrell confirmed receipt of her medical release and restored her to active status on the morning of May 26, 2023. *Id.* at 27. Sims believed she could return as early as May 29 but did not return until May 31. *Id.* at 27-28.

On returning, Sims clashed with Lisa Kline, a white General Manager who had filled in during Sims's leave and who, with her team, was training at Vestavia Hills before transferring to a new location opening nearby. *Id.* at 25, 28; Doc. 52 at 17. In the week before Sims's termination, Sims "walked by a table where [Kline] and a group of all Caucasian people were sitting. [Sims] could not hear everything that was said but she heard [Kline] say 'black bitch.'" Doc. 12 at ¶35; Doc. 60 at 29; Doc. 52 at 20 n.9. Sims later testified that she "figured [Kline] was talking about me," and "assumed that she was talking about me. It was like I knew she was talking about me." Doc. 44-1 at 60-61. Sims mentioned the comment to Cervantes, who did not discipline Kline. Doc. 60 at 45.

After Sims returned from leave, Monique Hodge complained to Cervantes that Sims had said "all gay people are going to Hell," a remark Hodge claimed was made in March 2023. Doc. 52 at 19; Doc. 60 at 31; Doc. 63 at 27. Keller-Blanton directed Cervantes to investigate. Doc. 52 at 20. Cervantes gathered corroborating statements from several employees, though he never spoke with Sims about the allegation. *Id.* at 20-21; *see also* Doc. 60 at 31-34.

One employee called Chipotle's HR hotline on June 15, 2023, to anonymously complain that Sims "has been displaying unprofessional behavior toward the caller and other employees." Doc. 44-6 at 48. The employee asserted that Sims had "been creating a hostile work environment for the LGBTQ+ team and being aggressive

with the caller and other employees," including yelling at an employee for a bad review the store had received "because [Sims] could not have the blame on her." *Id.*

Alayna Gates described Sims as "[h]ard to work with" and stated "that the store [wa]s very divided" because of Sims's approach. Doc. 45-18 at 6. According to Gates, she had witnessed Sims yelling at an employee in June 2023. *Id.* Sims allegedly demanded that Madison Bryant clock out from her shift, "[t]hen when [Bryant] clocked out, [Sims] told [Bryant] that she was abandoning her [j]ob." *Id.*

Bryant corroborated Gates's account and stated that she was now "looking for a transfer to another store because she no longer feels comfortable working at Vestavia." *Id.*

Lisa Kline also submitted a written statement dated June 22, 2023, which alleges, among other things, that Sims had "screamed at" Kline in front of other employees, and that she threatened Kline by stating, "You better go find something safe to do." Doc. 44-9 at 62. When Kline asked if Sims was threatening her, Sims purportedly responded, "You heard me, I didn't stutter. Go find something safe to do. No[w] run and call and tell that." *Id.* Kline reported that she didn't "feel comfortable or safe for myself or the other staff." *Id.*

As Keller-Blanton put it, multiple employees had alleged "that [Sims] has made comments about gay people going to hell and are alleging she makes

disrespectful and offensive comments and is negatively impacting the store since her return." Doc. 45-18 at 7.

After receiving these complaints, the supporting statements, and Keller-Blanton's recommendation, Cervantes terminated Sims on June 24, 2023. The Employee Corrective Action Form that Cervantes provided to Sims upon termination listed under "Reason for Corrective Action" the following:

> Totti has made offensive and disrespectful comments in front of other crew members. These comments have negatively affected the store. Totti has also made a comment about Gay people going to hell in front of the employees at Vestavia. The comment about gay people going to hell violates Chipotle's Anti-Discrimination policy and Code of Ethics and has resulted in her immediate termination.

Doc. 44-9 at 63; Doc. 52 at 21-22; Doc. 60 at 29-30. Sims was replaced by a white employee, Stephen Epperson. Doc. 60 at 45.

Sims disputes that she made the comment about gay people referenced above. It is undisputed that a lesbian couple worked in the store, and Sims testified that Hodge "told me that they have attitudes, one of them have attitudes with her [Hodge] when she is talking to the other one." Doc. 44-1 at 61. Hodge submitted a letter asserting that Sims's response to Hodge's concern was, "Well you just tell them that you don't want to go to hell with them." Doc. 44-12 at 33; Doc. 60 at 31. Sims notes that this statement Cervantes received does not use the words "lesbian," "gay," or "homosexual." Doc. 60 at 31.

While Sims disputes what she allegedly said regarding gay people, she does not dispute Chipotle's assertion that employees "described Sims calling employees 'fat ass,' making threatening remarks like 'I'm from Memphis; y'all don't know me,' physically bullying staff, firing employees who requested transfers, and creating a toxic work environment." Doc. 52 at 20. Likewise, in response to Chipotle referencing "descriptions of Sims using rude and foul language to address subordinates, and yelling at employees without justification," *id.* at 21, Sims's only response is to note that "[t]he statements from K[l]ine, Gates, and Bryant do not mention anything about a 'gay' comment," Doc. 60 at 8.[2] Thus, while Sims disputes that she made the comment about gay people that Chipotle attributed to her, she does not dispute that she made the other comments or took the other actions discussed above.

Sims filed her Charge of Discrimination with the EEOC on August 21, 2023. Doc. 52 at 22. She filed this lawsuit on December 20, 2024, and amended her complaint on February 13, 2025. *See* Docs. 1, 12.

---

[2] Sims cites here to Doc. 52 at 13, but this appears to be a typo because it is situated between citations to Doc. 52 at 20 and Doc. 52 at 22, and Doc. 52 at 21 is where Chipotle mentions statements from Kline, Gates, and Bryant.

**STANDARD**

Summary judgment is appropriate when the facts, supported by the record and taken in the light most favorable to the nonmovant, "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A factual dispute is genuine if the evidence would allow a reasonable jury to find for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And one is "material" if it is an element of the underlying claim that might affect the case's outcome. *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997). The movant bears the initial burden of proving that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986). The movant may discharge its burden by pointing out to the district court that there is no evidence supporting an essential element of the nonmovant's case. *Id.* at 325. The district court must view the evidence and all factual inferences in the light most favorable to the nonmovant. *Johnson v. Clifton*, 74 F.3d 1087, 1090 (11th Cir. 1996).

Once the movant has adequately supported its motion, the nonmovant then must show that summary judgment is improper by coming forward with specific facts showing a genuine dispute. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). If the record evidence would not permit a rational trier of fact to find for the nonmovant, then there is no genuine dispute for trial. *Id.* All

10

reasonable doubts, however, are resolved in favor of the nonmovant. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).

## DISCUSSION

### I.      Racial & National Origin Discrimination (§ 1981 & Title VII)

Sims argues that Chipotle discriminated against her because she is black and because of her national origin.[3] Title VII and § 1981 claims are both analyzed under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Once the plaintiff establishes a prima facie case, the employer need only articulate a legitimate, non-discriminatory reason for its action; the burden then returns to the plaintiff to show that the proffered reason is pretext for discrimination. *Id.* at 802-04. An employee may also "prove a claim of discrimination by presenting sufficient evidence that would permit a reasonable factfinder to find that the employer discriminated against the employee, even if they do not rely on this burden-shifting framework." *Melton v. I-10 Truck Ctr. Inc.*, 166 F.4th 905, 913 (11th Cir. 2026) (internal quotation marks and brackets omitted). This "rearticulation of the summary judgment standard" is often referred to as "the 'convincing mosaic' metaphor." *Id.*

---

[3] Chipotle argues that Sims's national-origin discrimination claim is precluded by the fact that she and Cervantes are both U.S. citizens. Doc. 52 at 45-46. That argument fails. National-origin discrimination occurs, even between U.S. citizens, when an employee is discriminated against because of her country of origin or that of her ancestors. *See Stewart v. Perdue Farms Inc.*, No. 5:09-cv-349, 2011 WL 2268951, at *4 (M.D. Ga. June 7, 2011).

Because § 1981 additionally requires the plaintiff to prove that race was a but-for cause of the decision, Sims's § 1981 claim fails if her Title VII claim fails. *Ossmann v. Meredith Corp.*, 82 F.4th 1007, 1014 (11th Cir. 2023).

Chipotle concedes that Sims can establish a prima facie case. Doc. 52 at 40-41. It likewise carries its own burden by explaining that it terminated Sims for at least two non-racial reasons: (1) making "offensive and disrespectful comments in front of other crew members," which "negatively affected the store," and (2) "also ma[king] a comment about Gay people going to hell in front of the employees at Vestavia," which "violates Chipotle's Anti-Discrimination policy and Code of Ethics." Doc. 45-14 at 2; Doc. 45-29 at 6; Doc. 52 at 19-22. The burden therefore returns to Sims to show that the proffered reasons for her termination were pretext for racial or national-origin discrimination. She cannot.

***First***, as noted above, Sims does not dispute that she made "various comments and actions which intimidated other employees in the store." Doc. 60 at 44. She merely asserts that she was not fired for that conduct because "the termination document prepared [by the] decision-maker Cervantes, clearly states that the reason for the Sims immediate termination is the comment about gays going to hell, not the other conduct referenced in the beginning of the form." *Id.* She also asserts that this reading of the form is bolstered by Keller-Blanton's recommendation that Chipotle

12

"terminate [Sims]'s employment due to her making discriminatory and offensive comments about gay people going to hell…." Doc. 44-12 at 45; Doc. 60 at 44.

But Sims misreads the termination form, which plainly gives two reasons for her termination: "[Sims] has made offensive and disrespectful comments in front of other crew members. These comments have negatively affected the store. [Sims] has *also* made a comment about Gay people going to hell in front of the employees at Vestavia." Doc. 45-14 at 2 (emphasis added). While the form further states that "[t]he comment about gay people going to hell violates Chipotle's Anti-Discrimination policy and Code of Ethics and has resulted in her immediate termination," *id.*, that sentence does not suggest that Sims's repeated "offensive and disrespectful comments" that were "negatively affect[ing] the store" were not a reason Chipotle fired Sims. Otherwise, there would have been no reason to list them as a "Reason for Corrective Action." *See Feliciano v. Dep't of Transportation*, 605 U.S. 38, 51-52 (2025) ("Whenever a reading arbitrarily ignores linguistic components or inadequately accounts for them, the reading may be presumed improbable.") (quoting A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts* 174 (2012)) (internal quotation marks omitted).

And Keller-Blanton's recommendation, if anything, bolsters Chipotle's case that Sims was terminated both for her undisputed bullying and her disputed comment about gay people. Keller-Blanton's email to Cervantes mentions that Sims's alleged

13

comment about gay people "align[s] with the concerns previously reported" about her, *see* Doc. 44-12 at 45, and Cervantes—as the decisionmaker—presented Sims the form with those additional statements about her offensive, disrespectful, and store-disrupting comments to other employees. That addition by the decisionmaker suggests that he fired Sims for both reasons, not just one.

Sims, therefore, has not created a genuine dispute of fact over Chipotle's well-supported position that Sims "was terminated for making offensive and disrespectful comments in front of other crew members." Doc. 45-29 at 6. That fact alone dooms her Title VII and § 1981 claims under the *McDonnell Douglas* framework. *Melton*, 166 F.4th at 915 ("Because I-10 articulated legitimate, non-discriminatory reasons for its conduct, Melton cannot prevail under the *McDonnell Douglas* framework unless he identifies substantial evidence that I-10's proffered reasons were pretextual.").

**Second**, and independently, Chipotle asserts that it fired Sims because Cervantes believed that Sims had made a "comment about gay people going to hell." Doc. 45-14 at 2; Doc. 52 at 41-44. Sims disputes this point, arguing that circumstantial evidence calls into question whether the comment was really why Chipotle fired her.

She notes, for example, that Kline, a white General Manager supervised by the same decisionmaker, allegedly called Sims a "black bitch," but was not punished.

14

Doc. 52 at 20-21 n.19; Doc. 60 at 45. Sims also notes that her alleged remark about gay people may have occurred as far back as March 2023, but was not reported until June 20, 2023, less than a month after Sims had returned from FMLA leave, days after her conflict with Kline, and the day her third HR complaint against Cervantes was closed. Doc. 60 at 31, 37, 52-53; Doc. 52 at 20. Further, Cervantes investigated the complaint and decided whether to terminate Sims, after having been the subject of Sims's HR complaints. Doc. 52 at 20-21, Doc. 60 at 30-37. And Sims argues that even though Hodge's written statement references "going to hell with" the lesbian employees, it is too great an interpretative leap to read that statement as a "comment about gay people going to hell." Doc. 45-14 at 2.

Even still, the pretext inquiry does not depend on whether Sims in fact made the remark, but on whether Cervantes honestly believed she did. *See Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991). For example, Sims notes that two of the corroborating declarants, Kendra Obitz and Brookelyn Aaron, could not have witnessed the remark because they did not work at the location when it was made. Doc. 60 at 32-34. But setting their statements aside, Cervantes still had Hodge's first-hand account and the accounts of others. *Id.* at 30-34. Sims also points to the fact that Cervantes never asked Sims for her side of the story. *Id.* at 37-38. While that bears on the fairness of the process, it does not suggest that race motivated

15

his decision, and an imperfect investigation does not itself show pretext. *E.E.O.C. v. Total Sys. Servs., Inc.*, 221 F.3d 1171, 1176-77 (11th Cir. 2000).

An employer acting on an honest, even if mistaken, belief that an employee violated a work rule does not thereby discriminate. *See Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1363 n.3 (11th Cir. 1999); *Alvarez v. Royal Atl. Devs., Inc.*, 610 F.3d 1253, 1266-68 (11th Cir. 2010). Nor may a plaintiff establish pretext by quarreling with the soundness of the decision: federal courts "do not sit as a super-personnel department" and an employer may fire an employee "for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all" so long as the reason is not discriminatory. *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000) (en banc) (internal quotation marks omitted).

Ultimately, the Court need not decide whether there is a genuine dispute of fact over whether Chipotle fired Sims for her alleged comment about gay people because she has not shown that the reason was a pretext for discrimination. In other words, "a plaintiff must show *both* that the employer's reason was false, *and* that discrimination was the real reason for the adverse action." *Ismael v. Roundtree*, 161 F.4th 752, 761 (11th Cir. 2025) (internal quotation marks and brackets omitted). The latter requirement "holds the same focus as the convincing mosaic standard." *Id.* And here, even if some aspects of the investigation into Sims's comment were

16

suspicious, there is no evidence suggesting that race or national origin was a reason why Chipotle acted.

Sims's proffered comparator evidence fails to establish discrimination. She highlights that Cervantes investigated and credited Hodge's complaint against her, but did not discipline Kline, a white General Manager who allegedly called Sims a "black bitch." Doc. 60 at 45. But this evidence does not show the sort of "systematically better treatment of similarly situated employees" that courts have deemed to be relevant under the convincing mosaic approach because Kline was not similarly situated to Sims. *Jenkins v. Nell*, 26 F.4th 1243, 1250 (11th Cir. 2022). Kline was a visiting General Manager training at the restaurant before transferring to a new location, and the allegation against her was a single, uncorroborated remark that Sims relayed informally, unlike the corroborated complaint against Sims that came through Chipotle's HR process accompanied by a recommendation from HR to terminate.[4] Doc. 52 at 17; Doc. 60 at 28-29.

Sims claims that Cervantes systematically treated Hispanic employees better than other employees: Specifically, that he kept a Hispanic General Manager's restaurant more fully staffed than hers, shielded Hispanic employees from discipline, transferred employees without her input, and spoke Spanish to other employees

---

[4] Sims recounts a handful of incidents in which she and Kline clashed, *see* Doc. 60 at 28-29, but there is no evidence that Sims ever reported these incidents, and they remain uncorroborated, unlike the uncontested allegations of bullying and harassment alleged about Sims, *see supra* at 6-9.

exclude her. *See* Doc. 60 at 16, 48. But these claims are either irrelevant to Sims's termination, completely without evidentiary support, or both. Sims's allegations regarding "Oscar," the General Manager whose store was more fully staffed, are supported only by Sims's deposition testimony wherein she claims that "[h]is store was full with Hispanic managers." Doc. 44-1 at 14. This evidence is too indefinite to support an inference of discrimination. Sims could not identify the employees involved or provide particulars, Doc. 52 at 23, and the connection between that allegation and her own termination is far too attenuated. As far as the Court can tell, the connection is as follows: Oscar receives more staffing than Sims, and a potential explanation for this difference is that Sims is black and Oscar is Hispanic, thereby permitting an inference that Cervantes generally prefers Hispanics, and therefore when he terminated Sims he may have been, at least in part, motivated by that bias. But because this connection relies on multiple unsupported inferences, it is purely speculative.

Moreover, any inference that Cervantes favored other General Managers over Sims because she was black is undermined by Sims's testimony. She could identify only one Hispanic General Manager she believed was treated more favorably than her (Oscar), and when informed that most of the General Managers supervised by Cervantes were black, Sims averred that "those stores were favored also." Doc. 44-1 at 14. Favoring other black General Managers over Sims might suggest a bias

18

against Sims, but not one tied to her race or national origin. *See Smith v. Potter*, No. 05-2149, 2006 WL 3050814, at *6 n.6 (D. Kan. Oct. 25, 2006), *aff'd*, 252 F. App'x 224 (10th Cir. 2007) ("This evidence … does not suggest that Caucasian employees were treated more favorably than plaintiff; rather, it suggests that all employees— white and black—were treated more favorably than plaintiff."); *Robinson v. Sailormen, Inc.*, No. 1:14-cv-44, 2017 WL 10635662, at *5 (N.D. Fla. Sept. 22, 2017) ("Plaintiff also asserts several white *and* black employees who did not attempt to take FMLA leave remained employed after she was terminated. This fact only undercuts her claim of discrimination by providing a basis to infer that both white and black employees were treated similarly.") (citation omitted); *cf. Bush v. Commonwealth Edison Co.*, 990 F.2d 928, 931 (7th Cir. 1993) ("Such a pattern, in which blacks sometimes do better than whites and sometimes do worse, being random with respect to race, is not evidence of racial discrimination.").

Sims's general claim that Hispanic employees were shielded from discipline and transferred without her input does not present a sound comparator, as those subordinate employees were not similarly situated to her. *See Lewis v. City of Union City, Ga.*, 934 F.3d 1169, 1185 (11th Cir. 2019) ("A 'convincing mosaic' may be shown by evidence that demonstrates … systematically better treatment of *similarly situated employees*.") (emphasis added); *see also Pruitt v. Universal Prot. Servs., LLC*, No. 1:20-cv-1884, 2023 WL 11959371, *8-9 (N.D. Ga. July 31, 2023), *report*

19

*and recommendation adopted*, No. 1:20-cv-1884, 2023 WL 11959370 (N.D. Ga. Sept. 29, 2023), *aff'd* 2024 WL 4971993 (11th Cir. Dec. 4, 2024).

Sims points to the timing of the complaint that led to her firing: although the remark was allegedly made as early as March 2023, Hodge did not report it until June 20, 2023, after Sims returned from leave and after her conflict with Kline, and on the same day Sims's third HR complaint was closed. Doc. 60 at 31, 48-49, 52-53. Though this proximity might suggest retaliation, it does not support an inference of racial discrimination. Suspicious timing earns a place in the mosaic when it links the adverse action to the protected characteristic at issue. *See Lewis*, 934 F.3d at 1185 ("[A] plaintiff will always survive summary judgment if he presents … a convincing mosaic of circumstantial evidence *that would allow a jury to infer intentional discrimination*.") (internal quotation marks omitted) (emphasis added). Here, suspicious timing links Sims's termination, if anything, to her HR complaints, a theory addressed in Part II below. But timing says nothing about whether Cervantes acted because Sims is black. The delay between the remark and its report, moreover, was Hodge's doing. Doc. 52 at 19-20; Doc. 60 at 35-36. The record shows Cervantes acted once the complaint reached him, Doc. 52 at 20, which cuts against an inference that he engineered it as a pretext for terminating Sims because of her race, particularly because there is no dispute that Sims said *something* to Hodge about

Hodge's concerns related to one member of a lesbian couple acting jealously when Hodge spoke to the other one.

Finally, Cervantes's use of his native language of Spanish with other native Spanish speakers whose English was not as good as his own, Doc. 44-7 at 32, does not begin to suggest discrimination against Sims. She offers no evidence other than her own speculation that Cervantes's decision was done to exclude her, rather than help other employees understand him. *See generally* Doc. 60.

Ultimately, these pieces do not combine into a "convincing mosaic" of circumstantial evidence. *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011). A mosaic must be assembled from evidence that, taken together, permits a reasonable inference of intentional discrimination, and may be built from evidence of suspicious timing and ambiguous statements, systematically better treatment of similarly situated employees, and evidence that the employer's justification is pretextual. *Berry v. Crestwood Healthcare LP*, 84 F.4th 1300, 1311 (11th Cir. 2023). But "[t]he circumstantial evidence" a plaintiff relies on "must 'directly create an inference of discrimination' … to survive summary judgment." *Pasley v. Mercedes-Benz U.S. Int'l, Inc.*, No. 7:24-cv-1050, 2026 WL 972895, at *9 (N.D. Ala. Apr. 10, 2026) (quoting *Ismael*, 161 F.4th at 763); *see also Smith*, 644 F.3d at 1328. Evidence that does not bear on whether Cervantes terminated Sims for a discriminatory reason, even if unflattering to Chipotle, does not contribute to the

21

mosaic. *Cf. Flowers v. Troup Cnty., Ga., Sch. Dist.*, 803 F.3d 1327, 1338 (11th Cir. 2015).

Sims's mosaic must also be measured against what the record establishes, without dispute, about why Chipotle acted. An inference of discrimination cannot be made in a vacuum, and judgment as a matter of law is appropriate "if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision," or if the plaintiff "created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000); *see also id.* at 150 (the summary-judgment standard "mirrors" the Rule 50 standard). In the days before Sims's termination, several employees independently reported her mistreatment of staff. Specifically, she was described as being aggressive towards her employees, Gates described her store as "very divided" under her leadership, Bryant sought a transfer (from the under-staffed store) to avoid working for Sims, and Kline reported that Sims screamed at her and told her to "go find something safe to do." *Supra* at 6-8. Employees likewise described Sims calling subordinates "fat ass," making remarks like "I'm from Memphis; y'all don't know me," and firing employees who requested transfers. Doc. 52 at 20. Sims disputes none of this. *Supra* at 8-9. And she has not

22

rebutted Chipotle's evidence that this conduct was a reason for her termination. *Supra* at 12-14; Doc. 45-14 at 2.

Undisputed misconduct of that breadth saps the probative force of the circumstantial evidence Sims has gathered. It is not enough for her simply to suggest discrimination as a potential alternative explanation for Cervantes's decision, because she "must show both that the employer's reason was false, and that discrimination was the real reason." *Ismael*, 161 F.4th at 761 (internal quotation marks and brackets omitted). When an employer supports its explanation and the employee fails to rebut it, her circumstantial evidence, even viewed as a whole, cannot sustain a reasonable inference of discriminatory intent. *See Berry*, 84 F.4th at 1313; *Melton*, 166 F.4th at 915. And just as the intervening discovery of misconduct severs an inference of retaliation that relies on timing, *Berry*, 84 F.4th at 1309, 1312, the corroborated and unrebutted reports of bullying that reached Cervantes in June 2023 sever any inference running from Sims's general allegations of preferential treatment to a racial motive for her termination. Those same reports also defeat her comparator theory a second time, for no other employee stood accused of comparable misconduct.

A Title VII plaintiff must produce evidence of discrimination because of a protected characteristic, rather than merely evidence of unfair or hostile treatment. *See Camacho v. Pemco World Air Servs., Inc.*, No. 1:05-cv-503, 2006 WL 2827243,

at *11 (M.D. Ala. Oct. 2, 2006) ("It is axiomatic that to succeed in demonstrating a *prima facie* case of race or national origin discrimination … the evidence must permit an inference that the alleged actionable employment practices are somehow related to the protected characteristic."). Thus, the difficulty for Sims is that the antagonism she describes suggests only an ordinary, if unpleasant, conflict with her supervisors having nothing to do with her race. *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) ("[P]ersonality conflicts at work that generate antipathy and snubbing by supervisors and co-workers are not actionable[.]") (internal quotation marks and citation omitted); *Roberts v. Potter*, 378 F. App'x 913, 914-915 (11th Cir. 2010) ("Title VII prohibits discrimination based on race and sex, but does not serve as a shield against harsh treatment that is based on personal animosity.") (internal quotation marks and citation omitted).

Tied up in all of this is Sims's claim of national-origin discrimination. Though she does not formally defend this claim through the *McDonnell Douglas* framework, *see generally* Doc. 60, the evidence supporting it largely overlaps with the "convincing mosaic" evidence presented to support her Title VII claim. Specifically, that Cervantes kept a Hispanic General Manager's restaurant more fully staffed, shielded Hispanic employees from discipline, transferred them without her input, and spoke Spanish to exclude her. Doc. 60 at 16, 48. As explained above, this fails

to support Sims's claim of racial discrimination, and for the same reasons fails to support a claim of national-origin discrimination.

Accordingly, Chipotle is entitled to summary judgment in its favor on Counts I and II of Sims's amended complaint.

## II. Retaliation

### A. § 1981 & Title VII

Sims claims that Chipotle fired her for complaining about discrimination. Doc. 12 at 14-16. To prove retaliation under Title VII or § 1981, a plaintiff must show that (1) she engaged in a protected activity; (2) she suffered an adverse action; and (3) a causal connection links the two. *Berry*, 84 F.4th at 1307; *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008). Sims's termination is indisputably an adverse action. *See Monaghan v. Worldpay US, Inc.*, 955 F.3d 855, 860 (11th Cir. 2020). Her claim therefore turns on the first and third elements, and her evidence falls into two groups that fail on different grounds: The activity Cervantes knew about was not protected, whereas the activity that was protected, he did not know about.

Sims complained directly to Cervantes about his speaking Spanish to Hispanic employees and about Kline calling her a "black bitch." Doc. 60 at 51. A protected activity requires a good-faith, objectively reasonable belief that the employer has violated the law. *Little v. United Techs., Carrier Transicold Div.*, 103 F.3d 956, 960

(11th Cir. 1997). "It is not enough for the employee merely to complain about a certain policy or certain behavior of co-workers and rely on the employer to infer that discrimination has occurred." *Webb v. R & B Holding Co.*, 992 F. Supp. 1382, 1389 (S.D. Fla. 1998).

Neither part of her complaint meets that standard. Sims does not speak Spanish and did not know what was being said between Cervantes and her employees; her objection appears to have been merely the speaking of a language she did not understand, rather than anything said in that language that she believed was unlawful. Additionally, because an employer may not forbid employees from ever speaking Spanish to one another, *see* 29 C.F.R. § 1606.7, "[Sims]'s claimed 'protected activity' amounts to an effort to make [Chipotle] institute a policy which, in all likelihood, would violate Title VII," *Webb*, 992 F. Supp. at 1390. Her opposition to the speaking of Spanish is therefore not based on an objectively reasonable belief that her employer violated the law because "plaintiffs may not stand on their ignorance of the substantive law to argue that their belief was reasonable." *Weeks v. Harden Mfg. Corp.*, 291 F.3d 1307, 1317 (11th Cir. 2002).

The Kline complaint fails for a related reason. Sims overheard two words, out of context, in a conversation she was not part of, and assumed the words referred to her. *See* Doc. 44-1 at 60-61. An employee must, "at the very least, communicate her belief that discrimination is occurring to the employer." *Demers v. Adams Homes of*

26

*Nw. Fla., Inc.*, 321 F. App'x 847, 852 (11th Cir. 2009) (quoting *Webb*, 992 F. Supp. at 1390). But there is no evidence that Sims expressed her belief to Cervantes that the remark was discriminatory. *See, e.g.*, Doc. 44-1 at 60-61; Doc. 44-2 at 7. And even if she did, there is no evidence suggesting that Sims's termination was connected in any way to her complaint about Kline. The absence of that connection is even more fatal in the retaliation context, since Sims must be able to show that her protected activity was not merely *a* consideration in her termination, but that her termination *would not have occurred at all* absent the protected activity. *See Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 924 (11th Cir. 2018).

Sims's HR hotline complaints alleged race discrimination and retaliation. *See generally* Doc. 45-17. Even assuming that these activities were protected, Cervantes was the decisionmaker in her termination, and a decisionmaker cannot retaliate for conduct he does not know about. *See Brungart v. BellSouth Telecomms., Inc.*, 231 F.3d 791, 799 (11th Cir. 2000). Sims filed her first two complaints anonymously, and Cervantes denied knowing she was the complainant.[5] *See* Doc. 44-7 at 21, 32-33. To carry her burden, Sims had to show that Cervantes knew, not that someone in the company knew and had the opportunity to tell him about it. *See Martin v. Fin. Asset Mgmt. Sys., Inc.*, 959 F.3d 1048, 1054 (11th Cir. 2020). She offers evidence

---

[5] Chipotle submitted Cervantes's ignorance of the complaints until after Sims took legal action as an undisputed fact in its motion. *See* Doc. 52 at 19. Sims did not dispute this fact in her response to the undisputed facts portion of Chipotle's motion, *see* Doc. 60 at 7, but does so in her argument section, *id.* at 51.

only that employees around Cervantes who had contact with him knew about her complaints. *See* Doc. 60 at 51-53. Namely, that Keller-Blanton processed Sims's complaints and later advised Cervantes on her termination, and that Waters questioned Cervantes during his investigation into the complaints. *Id.* at 51-53 & n.1.

Neither fact shows knowledge. That Waters asked Cervantes about his own conduct does not mean that he necessarily revealed who complained, and nothing else in the record suggests that he did. *See* Doc. 44-10 at 21, 23, 30-31; *see also* Doc. 44-7 at 33. Similarly, the fact that Keller-Blanton *could have* told Cervantes is not evidence that she *did*. *See Martin*, 959 F.3d at 1054. The inference Sims asks the potential factfinder to draw is that one of them disclosed her identity, but she points to nothing suggesting that such a thing occurred. An unfounded inference is simply speculation, which cannot defeat summary judgment. *See Gadsby v. Am. Golf Corp. of Cal.*, 557 F. App'x 837, 840 (11th Cir. 2014).

Sims's third complaint, filed under her own name, alleged that Cervantes and Waters were not permitting her to return from medical leave. *See* Doc. 45-24 at 3. It was resolved on June 20, 2023, the day Cervantes reported Hodge's complaint to human resources. Doc. 60 at 52-53. That coincidence invites suspicion, but two facts dispel it: First, Sims's third complaint concerned Cervantes's alleged interference with Sims's return from FMLA leave, rather than opposition to a practice Title VII

28

forbids, so it is not a protected activity under this count. *See* 42 U.S.C. § 2000e-3(a). And second, the investigation that ended Sims's employment began with Hodge's report. Doc. 60 at 30-31. An employer does not retaliate by acting on a complaint it did not solicit, and mere temporal proximity to a complaint the decisionmaker neither knew about nor set in motion does not establish causation. *Rudy v. Walter Coke, Inc.*, 613 F. App'x 828, 830 (11th Cir. 2015).

Finally, and independently, Sims's claim fails because she has not rebutted Chipotle's evidence that it fired her for making "offensive and disrespectful comments in front of other crew members" that "negatively impacted the store." Doc. 45-14 at 2. An employee may rely on the *McDonnell Douglas* framework or a convincing mosaic of circumstantial evidence to prove retaliation. *See Berry*, 84 F.4th at 1310. But under either approach, when an employer presents evidence of "a nonretaliatory explanation, … the employee needs to rebut that explanation." *Id.* at 1313. Because Sims has not rebutted that explanation, "the circumstantial evidence cited by [Sims]—viewed as a whole and in the light most favorable to her—does not create a reasonable inference of intentional retaliation." *Id.*

Sims's § 1981 claim, which shares the elements of the Title VII claim, *see Goldsmith v. Bagby Elevator Co., Inc.*, 513 F.3d 1261, 1277 (11th Cir. 2008), fails with it. Accordingly, Chipotle is entitled to summary judgment in its favor on Count III.

29

## B. FMLA Retaliation

Sims claims that Chipotle fired her for taking FMLA leave. Doc. 12 at 16. The Eleventh Circuit analyzes claims of FMLA retaliation through the same framework as Title VII retaliation. *See Tanner v. Stryker Corp. of Michigan*, 104 F.4th 1278, 1288 (11th Cir. 2024). Critically, "the proper causation standard for FMLA … retaliation claims is but-for causation." *Lapham v. Walgreen Co.*, 88 F.4th 879, 893-94 (11th Cir. 2023). Thus, Sims must show that her termination would not have occurred absent retaliatory animus. *Id.* at 894.

Unlike Sims's Title VII retaliation claim, which failed in part because Cervantes did not know of Sims's hotline complaints and because the conduct he did know of was not protected, those problems do not exist here. Sims's leave was a protected activity, *see Jones v. Aaron's Inc.*, 748 F. App'x 907, 917 (11th Cir. 2018), and Cervantes surely knew of it, as replacements were assigned to cover the restaurant while she was out, Doc. 44-7 at 39-40. Sims's FMLA claim, therefore, turns on causation and pretext.

Sims was fired roughly three weeks after returning from leave, and such close timing ordinarily establishes causation. *Bechtel Const. Co. v. Sec'y of Lab.*, 50 F.3d 926, 934 (11th Cir. 1995). But Chipotle has supplied a legitimate, non-retaliatory reason for Sims's termination, that being her offensive and disrespectful comments.

30

*See* Doc. 52 at 51-52 (incorporating justification given for Sims's termination offered against her Title VII claims).

While temporal proximity supports Sims's prima facie case, it does not permit her claim to survive. Where the reason an employer proffers is "one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and [she] cannot succeed by simply quarreling with the wisdom of that reason." *Alvarez*, 610 F.3d at 1266. And where "a plaintiff fails to rebut the defendant's proffered non-discriminatory reasons for its actions, that failure tends to make the 'mosaic' significantly less convincing." *Pasley*, 2026 WL 972895, at *9.

Cervantes learned about Sims's offensive and disrespectful comments after she returned from FMLA leave, and she has failed to dispute either that she engaged in that conduct or that Chipotle fired her for it. *See supra* at 8-9, 12-14. Such an "intervening discovery of misconduct fatally undermines the probative value of temporal proximity between [Sims's] protected activity and her termination." *Berry*, 84 F.4th at 1312. Without more, no reasonable jury could infer retaliation, let alone the idea that Sims would not have been terminated had she never sought medical leave. Accordingly, Chipotle is entitled to summary judgment in its favor on this claim.[6]

---

[6] Chipotle argues in the alternative that Sims's FMLA and Title VII theories are mutually exclusive, because a termination can have only one but-for cause. *See* Doc. 52 at 52. That argument is incorrect. "Often, events have multiple but-for causes," and a defendant "cannot avoid liability just by citing some other factor that contributed to its challenged employment decision." *Bostock*

31

## III.   FLSA Overtime

Sims claims that Chipotle misclassified her as exempt from the FLSA and owes her overtime. Doc. 12 at 16-20. Although her title was General Manager, she contends that understaffing forced her to spend most of her time working the line, cooking, cleaning, and serving, and that Cervantes stripped her of real authority, so that management was not her primary duty. *Id.*; Doc. 60 at 9-14. Chipotle answers that Sims was a bona fide executive and therefore exempt from the FLSA's overtime requirements. Doc. 52 at 29-39.

The FLSA exempts "any employee employed in a bona fide executive, administrative, or professional capacity." 29 U.S.C. § 213(a)(1). The exemption is an affirmative defense, and Chipotle bears the burden of proving it by "clear and affirmative evidence." *Klinedinst v. Swift Invs., Inc.*, 260 F.3d 1251, 1254 (11th Cir. 2001); *see also Corning Glass Works v. Brennan*, 417 U.S. 188, 196-97 (1974). To prevail, Chipotle must show that Sims earned a salary of at least $684 per week, that management was her primary duty, that she customarily and regularly directed two or more employees, and that she had authority to hire or fire, or that her recommendations on such decisions carried particular weight. 29 C.F.R. § 541.100(a) (effective January 1, 2020, to June 30, 2024). Failure on any element

---

*v. Clayton Cnty.*, 590 U.S. 644, 656 (2020). A plaintiff may therefore plead that more than one protected characteristic or activity was a but-for cause of a single decision. *See Ismael*, 161 F.4th at 761.

is fatal to the defense. *Barreto v. Davie Marketplace, LLC*, 331 F. App'x 672, 678 (11th Cir. 2009).

Sims does not dispute that she earned well above the salary threshold or that she customarily directed two or more employees. Doc. 52 at 29-30; Doc. 60 at 41-44. She contests only the other two elements—whether management was her primary duty and whether she possessed the requisite hiring-and-firing authority. Doc. 60 at 41-44. Because the latter is itself a component of the former, the Court considers these elements together.

Primary duty means the principal or most important duty the employee performs, judged by the character of the job as a whole. 29 C.F.R. § 541.700(a). Four considerations guide the inquiry: the relative importance of the managerial duties, the time spent on non-managerial work, the employee's freedom from supervision, and the relationship between the employee's salary and the wages of the workers she supervises. *Id.*

Sims was the highest-ranking employee at the restaurant. *See* Doc. 45-31 at 2. She hired and fired, set schedules, ensured food-safety compliance, and reviewed vendor invoices, and she terminated at least 27 employees for cause during her tenure. Doc. 44-1 at 22-23; Doc. 52 at 8-12, 32-35; Doc. 60 at 6-7; *see generally* Doc. 44-4. Whatever else she did, the restaurant's management was hers; no other on-site employee was directly responsible for those duties because, among other

things, "[her] name [wa]s on the store." *See* Doc. 44-1 at 38. The importance of Sims's managerial duties is also uncontested. *Compare* Doc. 52 at 32-35 *with* Doc. 60 at 41-42.

The salary factor points the same way and is undisputed. Sims earned between 155% and 181% more than the hourly employees she supervised, and she alone was eligible for managerial bonuses. Doc. 52 at 33-34, 38; Doc. 44-1 at 33.

Against these facts, Sims argues the time factor: she says that understaffing forced her to spend most of her hours on manual tasks at the expense of her managerial duties. *See* Doc. 60 at 6-7, 9-13, 41-42. But an employee may have management as her primary duty even when she spends most of her time on non-exempt work, and courts have regularly so held for managers who run a single restaurant or store. *See* 29 C.F.R. §§ 541.700(b), 541.106; *Murray v. Stuckey's, Inc.*, 939 F.2d 614, 617-20 (8th Cir. 1991); *Donovan v. Burger King Corp.*, 675 F.2d 516, 521-22 (2d Cir. 1982); *Donovan v. Burger King Corp.*, 672 F.2d 221, 226 (1st Cir. 1982). Sims ran the restaurant while she worked the line, and performing both does not necessarily convert her into a non-exempt employee because "one can still be 'managing' if one is in charge, even while physically doing something else." *Donovan*, 672 F.2d at 226; *see also* 29 C.F.R. § 541.106(a). As Chipotle demonstrates with numerous citations to Sims's deposition and other parts of the record, "Sims could, and did, simultaneously perform many management tasks while

34

doing non-managerial work, including supervising employees, disciplining employees, dealing with vendors, managing labor costs, resolving payroll issues, recruiting, enforcing workplace policies, combating theft, and completing paperwork among other things." Doc. 52 at 31. Records show that Sims performed many of her managerial tasks during normal business hours when she would be directing hourly employees, *id.* at 32, which she regularly and customarily did.

That leaves freedom from supervision and the related question of hiring authority. Sims argues that Cervantes overrode her decisions, refused some of her requests to hire, and required his approval before she distributed schedules. *See* Doc. 60 at 9-13. The executive exemption, however, does not require unfettered authority. It may exist where an employee simply makes recommendations that are given particular weight, 29 C.F.R. § 541.100(a)(4), and an employee may exercise that authority even though a superior reviews her decisions, *see* 29 C.F.R. § 541.105 ("An employee's suggestions and recommendations may still be deemed to have 'particular weight' even if a higher level manager's recommendation has more importance and even if the employee does not have authority to make the ultimate decision as to the employee's change in status.").

Sims terminated 27 employees for cause. *See generally* Doc. 44-4. She admits that "most of the people … [she] terminated, [she] hired." Doc. 44-1 at 36. She admits that she hired "[m]ost everybody who was cleared to work" and did so "on

the spot." *Id.* at 47. She points to only two examples of employees she was not permitted to rehire, both of whom she could not recall the names of, and one of whom she did not know why he was ineligible. *Id.* at 49-50. Given the largely unrestricted nature of her authority to hire and fire employees, it would be irrational for a jury to infer that she did not possess, at the very least, the power to offer recommendations that were given particular weight. And nothing suggests that she experienced anything approximating the level of micromanagement the Eleventh Circuit has observed elsewhere in fulfilling her managerial duties. *See Morgan v. Fam. Dollar Stores, Inc.*, 551 F.3d 1233, 1270 (11th Cir. 2008) (finding that directives and manuals which "controlled virtually every aspect of a store's day-to-day operations" obviated alleged managers' exercise of discretion).

Accordingly, every factor favors exemption except for the factor of time spent on non-managerial work. And even accepting Sims's contentions about how she spent her time, she was "the person 'in charge' of a store" and thus "ha[d] management as h[er] primary duty, even though [s]he spen[t] the majority of h[er] time on non-exempt work…." *Donovan*, 672 F.2d at 227; *see also Jackson v. Advance Auto Parts, Inc.*, 362 F. Supp. 2d 1323, 1335 (N.D. Ga. 2005) ("Moreover, despite their contention that they spent the bulk of the majority of their time performing non-managerial duties, such duties were performed simultaneously with their managerial functions…. Under such circumstances, management of their

36

respective stores was Plaintiffs' primary duty."). "[T]he employee's primary duty will usually be what [s]he does that is of principal value to the employer, not the collateral tasks that [s]he may perform, even if they consume more than half h[er] time." *Cofield v. AutoZone Stores, Inc.*, No. 2:02-cv-2436, 2005 WL 8180085, at *13 (N.D. Ala. Aug. 31, 2005). Here, Sims has not rebutted Chipotle's evidence showing that Sims's principal value to Chipotle was her managerial work, Doc. 52 at 32-35, even if short staffing caused her to spend more time on other tasks.

Chipotle has therefore carried its burden of establishing the executive exemption by producing clear and affirmative evidence of its entitlement to it, and Sims has not raised a genuine dispute on any element of the defense. Summary judgment is therefore warranted in Chipotle's favor on Count V.

## CONCLUSION

Because no genuine dispute of material fact remains on any count, the Court **HOLDS** that, as a matter of law, Sims has failed to produce evidence sufficient to sustain Counts I-IV of her amended complaint. The Court **FURTHER HOLDS** that Sims has failed to produce evidence that would create a genuine dispute of a material fact regarding Chipotle's entitlement to the executive exemption against her FLSA claim, whereas Chipotle has produced clear and affirmative evidence demonstrating the application of that exemption. Accordingly, the Court **GRANTS** Chipotle's Motion for Summary Judgment (Doc. 47) as to all counts.

**DONE** and **ORDERED** this 17th day of July, 2026.

**EDMUND G. LACOUR JR.**
UNITED STATES DISTRICT JUDGE

38